**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5203-18T3

ERNEST LUCAS,

     Plaintiff-Appellant,

and

JASMIN MOORE,

     Plaintiff,

v.

JAMIE BADAGLIACCO,
ATLANTICARE HEALTH
SYSTEM, INC., and
ATLANTICARE PHYSICIAN
GROUP, PA,

     Defendants-Respondents.

_____

        Submitted March 12, 2020 – Decided September 22, 2020

        Before Judges Suter and DeAlmeida.

        On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Docket No. L-0798-16.

Flynn & Associates, PC, attorneys for appellants (Gary F. Piserchia, on the brief).

Fox Rothschild, LLP, attorneys for respondents (Eric Wood, on the brief).

The opinion of the court was delivered by

SUTER, J.A.D.

Ernest Lucas (plaintiff) appeals the June 21, 2019 order denying his motion for a new trial following a jury verdict entered in favor of Jamie Badagliacco (defendant), Atlanticare Health System, Inc. and Atlanticare Physician Group, PA (collectively Atlanticare). He argues the motion should have been granted because the verdict was against the weight of the evidence, defendant made arguments to the jury that were unsupported by the evidence, and defense counsel made improper personal attacks against plaintiff's counsel, which included allegations he referred plaintiff to specific physicians for evaluation. We affirm denial of the motion.

## I.

In April 2016, plaintiff and his fiancée, Jasmin Moore (Moore), filed a medical malpractice complaint against Atlanticare alleging negligence, carelessness and recklessness arising from a blood draw for routine blood work, which plaintiff alleges caused injury requiring compensatory and punitive

damages.  Moore claimed damages for the loss of consortium.  Atlanticare denied liability.  Plaintiff amended the complaint to add defendant, pleading the same causes of action.  Defendant and Atlanticare denied liability.

The case was tried to a jury.  The facts are found in the trial record. On May 14, 2014, plaintiff went to an Atlanticare Physician Group office to have blood drawn.  Defendant was the phlebotomist.  Plaintiff testified when defendant inserted the needle, he knew "something's not right."  He testified he "instantly started feeling pain."  He told defendant something was not right, but she "laughed it off," joking about whether he was afraid of needles. Plaintiff claimed when the blood flow did not start, defendant pushed the needle further in until it did. He testified his arm "started jumping on its own, shaking."  He told defendant to take the needle out.  The pain in his arm did not go away.

Plaintiff saw Dr. Arvinde Patel on May 21, 2014, who referred him to the Rothman Institute.  Plaintiff testified the Rothman Institute provided him a list of doctors.  He called his lawyer and then went to Dr. Philip Getson because his lawyer recognized that name. Plaintiff testified his arm has a "burning sensation, tingling sensation, sharp pain like somebody's sticking me with needles, stabbing me.  It's constant, weakness."

A-5203-18T3

Defendant testified she had no recollection of plaintiff or the blood draw. She testified she would have stopped "immediately" if a patient "complained of significant pain, or there was any deviation from normal pain of a blood draw . . . ." She testified the computer printout from this blood draw indicated "[w]here it was collected, the time, [and] who collected it . . . ." There was an area on the form for added comments, but this was blank. If there was anything unusual about the blood draw, defendant testified she would add this to the comment section. If plaintiff had complained of extreme pain, she testified "I would put it in the comments section, and also alert my supervisor [] or the doctor if needed." She testified if someone had a reaction like plaintiff claimed, she would "take the needle out immediately. . . [,] apply pressure [,] . . . bandage, and . . . secure the patient, and . . . call either for help or tell the doctor to come check what's going on."

Dr. Jon Glass testified for plaintiff that complex regional pain syndrome (CRPS) is a result of "an injury to the nerve and the changes that it causes in the nerve." He testified it is caused by a traumatic injury. Plaintiff was referred to him for evaluation. Plaintiff's pain was localized to the right upper extremity, radiating toward the shoulder. Glass testified there was nerve injury caused by the blood draw. He diagnosed plaintiff with CRPS based on his evaluation.

4 <span>A-5203-18T3</span>

On cross-examination, Glass testified plaintiff was referred to him by plaintiff's attorney, who previously referred other patients to Glass for evaluation for CRPS. He testified that typically patients were referred to him by doctors, not by attorneys. Glass evaluated plaintiff but did not provide him medical treatment.

Dr. Philip Getson testified as an expert in the diagnosis and treatment of reflex sympathetic dystrophy and CRPS. He testified plaintiff developed CRPS in the right arm as a result of the blood draw on May 14, 2014. He evaluated plaintiff, but did not provide him with medical treatment.

Gary Young testified for plaintiff as a vocational expert and vocational counselor. He performed a vocational evaluation at the request of plaintiff's attorney. Young testified plaintiff could not return to his job performing cable installations but was able to work as a security guard, earning less.

On cross-examination, Young acknowledged plaintiff's case was referred to him by plaintiff's attorney and he had reviewed other cases for him. Young also acknowledged he did not review any of plaintiff's school records, he did not review any records from prior employers regarding plaintiff's work performance, whether it was good or bad, and he did not review any records from Burger King—including performance records—where plaintiff was

employed. Young acknowledged he did not review plaintiff's job descriptions or look at videos showing what plaintiff could or could not do. He did not call plaintiff's prior employers or question the circumstances under which he had left his employment.

Claire Hoffman, a nurse, testified for plaintiff that the blood was drawn from an inappropriate location on plaintiff's arm, creating the risk of nerve damage. She testified this blood draw did not meet the appropriate standard of care.[1]

Defendant's expert, Dr. Devi Nimpiaparampil, a pain management specialist, testified that plaintiff's symptoms were not consistent with the diagnosis of CRPS. She did not see any evidence of physical limitations by plaintiff. She testified the needle either can be in the vein collecting blood or in the nerve, but not in both. There was no documentation of anything abnormal about the blood draw. It was her opinion based on a review of the evidence that plaintiff "did not sustain an injury to a nerve" from the blood draw.

Dr. Arvinde Patel testified that he was a doctor employed by Atlanticare. The records indicated that plaintiff had a blood draw on May 14, 2014, but there

---

[1] William E. Harris also testified for plaintiff as a "forensic economist [which] is an individual who calculates monetary losses in various types of disputes in the courts."

A-5203-18T3

was no mention he complained of pain. Patel testified if a patient made a complaint to him, he would have included this in his notes. On May 21, 2014, plaintiff returned for a review of his blood work. Patel had no recollection of treating plaintiff that day, however, the record documented that plaintiff complained of pain in his elbow from the blood draw and he was bruised. There was no recorded complaint of numbness or inability to move his right arm.

Kathleen Ashton, Ph.D., testified as an expert in the field of nursing and blood draws. She testified the "blood draw was done correctly according to the standards of care." She opined "everything was done according to the way blood draws should be done."

On May 14, 2019, the jury returned a no-cause verdict finding defendant did not "deviate from the accepted standards of care in her treatment of the plaintiff." Plaintiff filed a motion for a new trial on June 4, 2019. The motion was denied on June 21, 2019.

The trial court found there were "clear questions of fact" about what occurred. There was conflicting expert testimony about how the blood draw was done. Because of the "significant conflicting testimony," the court could not find the verdict was "so far afield that it cause[d] the court to question whether there was justice on the merits." The questions asked on cross-examination to

7

plaintiff's vocational expert were "fair game with respect to credibility. The experts can always be questioned about what records they did or did not review[.]" With respect to the plaintiff's improper conduct allegations, the court did not recall defense counsel pointing at plaintiff's counsel to imply that plaintiff's counsel set up the claim. There was nothing about the conduct of counsel that the court recalled "was so clear and plain [that the court felt it] had to jump in." It was not overly prejudicial for the defense to say that plaintiff's counsel referred plaintiff to Getson.

Plaintiff appeals the denial of his motion for a new trial raising these issues:

> A. The Jury's Verdict of No Cause was Against the Weight of the Evidence.
>
> B. Defendant's Repeated Arguments Regarding Evidence that Did Not Exist was Prejudicial Requiring a New Trial.
>
> C. Defense Counsel's Personal Attacks Towards Plaintiff's Counsel Were Improper and Require a New Trial.
>
> D. Defendant's Statements and References that the Plaintiff had been sent to a Physician by Counsel Were Improper and Require a New Trial.

A-5203-18T3

## II.

Under the Rules, a trial court "shall grant [a motion for a new trial] if, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law." R. 4:49–1(a). A judge reviewing whether a verdict constitutes a miscarriage of justice must "view the evidence in the light most favorable to the party opposing the motion for relief[,]" Kozma v. Starbucks Coffee Co., 412 N.J. Super. 319, 325 (App. Div. 2010), and "canvass the record, not to balance the persuasiveness of the evidence on one side as against the other, but to determine whether reasonable minds might accept the evidence as adequate to support the jury verdict." Dolson v. Anastasia, 55 N.J. 2, 6 (1969) (quoting Kulbacki v. Sobchinsky, 38 N.J. 435, 445 (1962)). In performing this function, a trial judge may not substitute his or her judgment for the jury's merely because he or she would have reached a different conclusion. Ibid.

We review a trial court's decision to grant or deny a motion for a new trial under the same standard. Risko v. Thompson Muller Auto. Grp., Inc., 206 N.J. 506, 522 (2011); see also Pellicer ex rel. Pellicer v. St. Barnabas Hosp., 200 N.J. 22, 52 (2009). To the extent plaintiff's arguments rest upon discretionary

decisions rather than the weight of the evidence, we "defer to the trial court's exercise of discretion unless its mistaken exercise prejudiced the substantial rights of a party." Pressler & Verniero, Current N.J. Court Rules, cmt. 4 on R. 2:10–2 (2020). As we discern no clear miscarriage of justice under the law, we affirm the denial of plaintiff's motion for a new trial.[2]

Plaintiff argues the verdict was against the weight of the evidence. He asserts no witness contradicted plaintiff's testimony that he voiced significant discomfort during the blood draw, and that the blood draw was contrary to defendant's policies and procedures. However, the record showed conflicting evidence. Even though defendant had no specific recollection of this blood draw, a record was made of the procedure. Defendant testified that had plaintiff reported the pain and shaking to which he testified, she would have made a notation in the comment section or the record. Furthermore, defendant's nursing expert Ashton testified that the blood draw did not deviate from the standard of care and that it was done properly. And, there was testimony the blood draw could not have occurred in the manner plaintiff described because blood could

---

[2] Defendant argues that plaintiff's motion for a new trial was filed one day late. See R. 4:49-1(b). In light of our decision on the merits, we have not addressed this procedural issue.

not be drawn from a nerve. The jury verdict resolved these conflicts in defendant's favor.

As a general rule, there is a presumption of correctness in jury verdicts. Baxter v. Fairmont Food Co., 74 N.J. 588, 598 (1977). "The jury's views of the facts and the credibility of the witnesses as expressed in its verdict are entitled to deference from both the trial and appellate courts." Ming Yu He v. Miller, 207 N.J. 230, 251-52 (2011). Thus, giving deference to the jury's verdict, there was ample evidence here to support it.

Plaintiff argues he was prejudiced and requires a new trial because his vocational expert was cross-examined about evidence that did not exist. We agree with the trial court that this was not a basis for a new trial.

"[A]n expert witness is always subject to . . . cross-examination as to the basis of his opinion." State v. Wakefield, 190 N.J. 397, 451-52 (2007) (quoting State v. Martini, 131 N.J. 176, 264 (1993)). The court has broad discretion to determine the scope of cross-examination. State v. Silva, 131 N.J. 438, 444 (1993); Persley v. N.J. Transit Bus Operations, 357 N.J. Super. 1, 9 (App. Div. 2003). An appellate court will not interfere in the absence of a clear abuse of discretion. Persley, 357 N.J. Super. at 9. "To determine the credibility, weight and probative value of an expert's opinion, one must [be able to] question the

facts and reasoning on which it is based." Wakefield, 190 N.J. at 452 (quoting Martini, 131 N.J. at 264 (1993)).

The questions asked of plaintiff's vocational expert on cross-examination focused on what he reviewed in formulating his opinion. This cross-examination highlighted the limitations of his review by pointing out potential sources of information he could have explored. There was no abuse of discretion in the scope of the cross-examination and thus, no basis for a new trial.

Plaintiff's counsel alleges that defense counsel made personal attacks against him by pointing at him and by suggesting to the jury that plaintiff's counsel referred plaintiff to the testifying physicians.

In the opening statement, plaintiff's attorney said that plaintiff was referred to Glass and Getson by his lawyer. He explained that both doctors "have reviewed cases for the lawyer before. Evaluated cases for them." Although there was no objection then, after the opening statement, plaintiff's counsel said:

> [PLAINTIFF'S COUNSEL]: Judge, I -- I'm concerned and I'm gonna request a . . . somewhat of a curative instruction about all of this pointing fingers at me and --
>
> THE COURT: At you?

[PLAINTIFF'S COUNSEL]: At me in -- in the opening. And, you know, saying his lawyer sent him to the doctor. I mean, those are privileged communications.

The court overruled the objection because he had already made rulings about the referral issue in a pre-trial motion and was not going to "revisit[ ]" them.

In the closing statement, defendant's counsel raised the same issue:

> [Plaintiff] says it was the Rothman Institute who referred him to both Dr. Glass and Dr. Getson. Except the experts that you saw on video said oh, no, it was the lawyer who referred [plaintiff] to Dr. Glass and Dr. Getson for an evaluation.
>
> So why is that important? . . . But there were other doctors. There were physical therapists. There were people who could have come in who actually evaluated the plaintiff to say this is what we found, this is what we thought. For whatever reason, none of these individuals came in to testify. Instead [plaintiff's counsel] sent [plaintiff] to doctors that he worked with in the past to evaluate the plaintiff and to determine what if any injury he had.

Plaintiff's counsel did not object. In his closing statement he responded, saying:

> And by the way, speaking of vague things, . . . they put this idea out there that, well, maybe [plaintiff] was not doing a good job at his job as a cable installer. And they said, well, we didn't bring anybody in for that. Not that there's any evidence whatsoever that that was the case . . . . There are these documents called subpoenas.

13

> We hear about them every day on CNBC and Fox News.
> They could have subpoenaed people from [his former
> employer]. That is all just smoke.

In the decision denying the motion for a new trial, the court noted it would have stepped in on its own if it observed any improper conduct by counsel. Our review of the record does not indicate there were any improper personal attacks on plaintiff's counsel that would require a new trial.

Related to this issue, plaintiff contends he was prejudiced by defense counsel's statements that his attorney referred him to Getson for evaluation. Getson did not testify to this in his de bene esse testimony. The trial court struck that question as part of a pre-trial motion because the doctor had not answered it.

It was an error to say that plaintiff was referred to Getson by his attorney, but this error did not warrant a new trial. Although Getson did not testify about an actual referral by plaintiff's attorney, he did testify he had not previously treated plaintiff, he prepared a report for plaintiff's attorney and sent it to him, he obtained the records for his review from plaintiff's counsel's office, and he did not provide any treatment to plaintiff. Then when the issue about Getson was raised again in the closing, there was no objection by plaintiff's counsel. Both Glass and Young testified that plaintiff's counsel referred plaintiff to them

for evaluations. Looking at this record as a whole, we cannot say that this error regarding Getson was so prejudicial that it constituted clear and convincing evidence of manifest injustice. It was at best harmless error. R. 2:10-2.

Plaintiff cites an unreported case in support of his argument. It has no precedential value and, in any event is factually different from this case. See R. 1:36-3.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION